**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE**

| | |
|---|---|
| GSV ACQUISITIONS, LLC and GSV MANAGEMENT, LLC | CASE NO.: |
| Plaintiffs, | |
| v. | JURY TRIAL DEMANDED |
| JON ELLISON | |
| Defendant. | |

## COMPLAINT

Plaintiffs GSV ACQUISITIONS, LLC and its wholly-owned subsidiary, GSV MANAGEMENT, LLC (together "GSV" or the "Company"), by their undersigned attorneys, files this Complaint against defendant, Jon Ellison ("Defendant") and allege, upon knowledge as to themselves and otherwise upon information and belief, as follows:

## NATURE OF ACTION

1. GSV brings this action to put an end to the ongoing unlawful activities of Defendant, a former managing director and managing partner of GSV, and recover damages caused by Defendant's unlawful activities.

2. Specifically, Defendant has been stealing GSV's trade secrets and infringing its trademarks and using them to pursue extracurricular deals without the knowledge or authorization of GSV's principals. Unbeknownst to GSV, Defendant's wrongful use of GSV's trade secrets and trademarks began at least eight (8) months ago. When GSV discovered on November 27, 2023 that Defendant was filching GSV's intellectual property and using it to pursue unauthorized deals

in violation of his agreements with GSV, he was removed as a managing director of GSV on December 1, 2023.

3. Unfortunately, things did not end there. GSV has recently learned that Defendant continued to infringe GSV's trademarks and purloined trade secrets even after he was separated from the Company as he continued to try to trick unwitting third parties into thinking they were doing deals with GSV. Indeed, on December 11, 2023, GSV learned Defendant had done exactly that when he met the prior month with a company he prospected for investment, Company 3, after sending that company an unauthorized letter of intent bearing GSV's trademarks. But for GSV's intervention, Defendant would have continued to falsely pass himself off as acting with the authority of GSV, including in a meeting with Company 3 Defendant had scheduled to take place the very next day, December 12, 2023.

4. So far, GSV is aware of at least seven (7) companies that Defendant prospected without GSV's knowledge or the requisite approvals, and without complying with the proper protocols needed to sign documents and enter into agreements on behalf of GSV. GSV believes there are likely additional companies that were targeted by Defendant and remain unaware of Defendant's deceptions.

5. By stealing GSV's confidential customer and target information, proprietary sales information and trademarks, Defendant takes unfair advantage of GSV's confidential vetting and its highly-sensitive target company list, as well as GSV's track record, business reputation, and years-long history of success.

6. Defendant's brazen conduct violates Tennessee and federal law and must be stopped before he causes further damage to GSV's brand, reputation, goodwill, and business opportunities. Defendant's behavior constitutes intentional violations of the Lanham Act

2

including trademark infringement, false designation of origin, and false endorsement; misappropriation of trade secrets; breaches of his contracts with GSV; and breaches of his fiduciary duties as a member of GSV.

7.     In these and other ways, Defendant has caused, and unless enjoined by this Court will continue to cause, significant harm to GSV by damaging its well-established and carefully cultivated reputation and goodwill.  Unless Defendant is enjoined and appropriate damages are awarded to GSV, Defendant's actions have also harmed third parties who have relied or may in the future rely on Defendant's misrepresentations and believe that they are entering into a transaction with GSV when they are not, because Defendant has executed term sheets and letters of intent to invest in companies without GSV's authorization, and appears likely to continue to do so.

## THE PARTIES

8.     GSV Acquisitions, LLC is a limited liability company organized under the laws of the State of Tennessee.  Its wholly-owned subsidiary, GSV Management, LLC, is a limited liability company organized under the laws of the state of Delaware.  The address of the registered office of GSV is 2035 Lakeside Centre Way, Suite 200, Knoxville, TN 37922.

9.     Upon information and belief, Defendant is a resident of Palm Springs, CA with an address of 955 W Ceres Rd, Palm Springs, CA 92262 and owns property in Tennessee located at 440 Windlass Drive, Lenoir City, TN 37772.

## JURISDICTION AND VENUE

10.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Lanham Act, 15 U.S.C. § 1051, *et seq*. This Court has supplemental jurisdiction over GSV's state-law claim pursuant to 28 U.S.C. §1367(a) because it

is related to GSV's Lanham Act claim and forms part of the case or controversy.

11.    This Court has personal jurisdiction over Defendant pursuant to TN ST § 20-2-214. Upon information and belief, Defendant transacts business within the State of Tennessee and/or contracts to supply goods or services in the State, and has committed tortious acts causing injury within the State while regularly doing or soliciting business in the State and/or should reasonably expect his tortious acts to have consequences in the State and derive substantial revenue from interstate or international commerce.

12.    Venue is proper in the Eastern District of Tennessee pursuant to 28 U.S.C. § 1391(b) and (c).

13.    The Operating Agreement of GSV Acquisitions, LLC (the "Operating Agreement"), attached hereto as Exhibit 1, which is at issue in this action, and to which Defendant is a signatory, contains a choice of law provision that states, "[t]he Operating Agreement, and all disputes arising hereunder, shall be governed exclusively by its terms and by the internal substantive laws of the State of Tennessee." *See* § 13.2.

14.    The Compensation Arrangement Agreement between Defendant, GSV Acquisitions, LLC, and GSV Equity Holdings (the "Compensation Arrangement"), attached hereto as Exhibit 2, which is at issue in this action, and to which Defendant is a signatory, provides that Defendant "irrevocably and unconditionally (1) agree[s] that any legal proceeding arising out of this Agreement shall be brought solely in the United States District Court for the State of Tennessee, or if such court does not have jurisdiction or will not accept jurisdiction, in any court of general jurisdiction in the State of Tennessee, (2) consent[s] to the exclusive jurisdiction of such court in any such proceeding, and (3) waive[s] any objection to the laying of venue of any such proceeding in any such court."

4

## FACTUAL BACKGROUND

**I.    GSV's Reputable Investment Business**

**A.    GSV's Business**

15.    Founded in 2015, GSV is an entrepreneurial private investment group that seeks opportunities in midmarket technology-enabled business service companies.  GSV works directly with founders who are interested in selling their businesses and have built technology platforms in fragmented markets such as transportation, senior care, automotive, legal, specialty medical, and payment processing.  GSV creates profit by identifying target companies interested in selling their business, 'tucking in' adjacent and complementary businesses, and utilizing GSV's founder and entrepreneurial operating experience to optimize its acquired companies' performance.

16.    GSV has been highly successful since its launch, and accordingly, has developed an excellent reputation in its field.  GSV has been responsible for the exponential growth of a number of businesses, including, most notably, Ministry Brands, LLC.  GSV has replicated the success of Ministry Brands, LLC with other companies using operational and roll-up acquisition strategies, providing historically strong returns to GSV as an investor, GSV's co-investors, as well as fees to GSV in connection with the services GSV provides.  GSV closes, on average, approximately thirty (30) deals per year.

17.    GSV's success is well-documented and publicized.  Various publications such as the Wall Street Journal have touted the successes of GSV and its investors and portfolio companies.[1]  GSV has also received wide recognition for its work in the investment space. In 2017,

---

[1] Laura Cooper, *Insight Venture Partners to Back Software Provider Ministry Brands*, THE WALL STREET JOURNAL (Oct. 31, 2016); Laura Cooper, *Private Equity-Backed Ministry Brands Expects to Garner $1.5 Billion or More in Proposed Sale,* THE WALL STREET JOURNAL (Aug. 25, 2016).

5

GSV and Mr. Croley were honored alongside Providence Strategic Growth for their involvement in the Large Market Deal of the Year by Buyouts.[2] In 2023, GSV was honored as the recipient of the Pinnacle Business Award in the Mid-Sized Business Excellence category.[3] In 2022, two deals that GSV was involved in were recognized at the 21st Annual M&A Advisor Awards.[4] GSV Director and Managing Partner, Lisa Stinnett, has been recognized by several organizations for her deal making prowess. As recently as 2023, Ms. Stinnett was honored as one of the Top 50 Women Leaders of Tennessee for 2023.[5]

18.     GSV's field of business is difficult to break into, and GSV relies heavily on its well-earned reputation in the private investment sector in order to garner and maintain clients. GSV depends in large part on this reputation and its historic success stories to attract prospective targets, and to, ultimately, acquire their businesses.

**B. GSV Protects Its Trademarks and Proprietary Information**

19.     To protect its business, GSV has registered and applied for the registration of

---

[2] Sam Sutton, *Deal of the Year, Large Market, 2017: Providence Equity, Ministry Brands*, BUYOUTS (Mar. 20, 2017) https://www.buyoutsinsider.com/large-cap-deal-of-the-year-providence-equity-partners/.

[3] *GSV Recognized as Mid-Sized Business Excellence Recipient at Pinnacle Business Awards*, GREATER SUM VENTURES (Mar. 7, 2023) https://greatersumventures.com/news/greater-sum-ventures-recognized-as-mid-sized-business-excellence-recipient-at-pinnacle-business-awards/.

[4] 21ST ANNUAL AWARD FINALIST LIST, M&A Advisor (2022) https://maadvisor.com/MANY/2022-MANY/21st_Annual_MA_Award_Finalist_List.pdf.

[5] Press Release, *Greater Sum Ventures, Lisa Stinnett Named To The Top 50 Women Leaders in Tennessee* (Nov. 8, 2023) https://greatersumventures.com/news/lisa-stinnett-named-to-the-top-50-women-leaders-in-tennessee/; Press Release, Greater Sum Ventures, *Lisa Stinnett Named Among Top 21 in '21 Southeast Dealmakers* (July 27, 2021) https://greatersumventures.com/news/lisa-stinnett-named-among-top-21-in-21-southeast-dealmakers/.

several trademarks with the United States Patent and Trademark Office namely:

a. The GREATER SUM VENTURES trademark is registered with the United States Patent and Trademark Office as of July 25, 2017 (US Registration Number: 5250254) (the "GSV Registered Mark"), attached hereto as Exhibit 3. The GSV Registered Mark has not been challenged since its registration.

b. Applications for federal trademark registration for GSV in plain text and the GSV logo stylized as **GSV** were filed with the United States Patent and Trademark Office on November 29, 2023 (US Serial Numbers: 98290430, 98290470) (the "GSV Marks", collectively with the GSV Registered Mark, the "GSV Trademarks") with a first use in commerce of March 2016, attached hereto as Exhibit 4 and Exhibit 5.

20. Since its founding, GSV has used the GSV Trademarks extensively, and repeatedly in interstate commerce, including throughout its website, in promotional materials, and in communications with clients and potential clients, and is thus well-known to those in the financial industry, both in Tennessee and nationwide.

21. GSV's business success also critically depends upon the protection and continued confidentiality of its proprietary information and trade secrets, including but not limited to its acquisition strategy playbook, business strategies, methods, databases, client lists, prospective client lists, forms, branding, intellectual property, investor presentations promoting and describing the work and success of GSV, and training of GSV employees and consultants (collectively, "Proprietary GSV Information").

22. Proprietary GSV Information at issue in this case includes, but is not limited to, (i) GSV's Target Customer Data, which contains lists of GSV potential target companies generated by GSV-developed proprietary software tool "Synth," evaluations of those companies using

GSV's proprietary taxonomy classifications, qualitative analysis concerning each company conducted by GSV analysts, and GSV's proprietary scoring and ranking method, which reflects GSV's unique investment criteria ("Target Customer Data"); and (ii) GSV's proprietary investor slide deck, which contains information concerning every investment GSV has made, the financial track record of that investment, detailed case studies containing concerning GSV's portfolio companies, information concerning its proprietary sourcing engine and software tool, and other non-public information ("Investor Deck").

23. Personnel and associates trained by GSV are given access to and are entrusted with Proprietary GSV Information for the sole purposes of engaging potential clients. Because much of the value of this information is due to its confidential and proprietary to GSV nature, GSV takes enhanced security measures to ensure its proprietary business information is kept secret and not disclosed outside employees at GSV. Specifically, GSV requires all personnel and associates to enter into agreements governing the scope of their responsibilities and services for GSV. Additionally, GSV's Target Customer Data, relating to analyses of potential targets, are protected by a user password and multi-factor authentication. GSV takes steps to ensure the secrecy of the Investor Deck, including that only those employees and officers at GSV involved in sourcing capital with a need to utilize its contents are given access to editable versions of the Investor Deck.

24. The combined possession of GSV's Target Customer Data and Investor Deck enables someone without authority to act on behalf of GSV to essentially step into GSV's shoes in the marketplace, armed not just with GSV's evaluated and classified target company list, but also with a presentation reflecting GSV's track record, business success, reputation, and the years-long history that led to GSV's development of the same. A founder's decision to sell their company is a life-altering, often gut-wrenching decision, and if a founder is duped—by, for example, a

8

person like Defendant using the GSV Trademarks, Target Customer Data, and Investor Deck—that deception may well have lasting effects. For example, a duped founder likely would never agree to sell their company to anyone associated in any way with the deception. Defendant's illicit conduct thus harms GSV's chance to invest in such a company or any other company that same founder is involved in.

## II. Defendant's Role at GSV

### A. Defendant Was Aware of His Limited Role at GSV

25.     Prior to 2017, Defendant was a salesperson for GSV. He was responsible for identifying acquisition targets potentially interested in selling their businesses to GSV or one of its portfolio companies.

26.     Defendant has never had any authority to enter GSV into any contracts without the authorization sign-off of GSV's officers or directors, and is not responsible for structuring deal terms or negotiating prices.

27.     Defendant is not, nor has he ever been, an authorized officer of GSV. Defendant is a non-voting member of GSV Acquisitions, LLC, and holds a 5% financial interest of GSV Acquisitions, LLC.

28.     Defendant's rights as a non-voting member are outlined in a Member Restriction Agreement signed in 2016 (attached hereto as Exhibit 6) as well as GSV Acquisitions' Limited Liability Company Operating Agreement and related amendments.

29.     Under the Operating Agreement, which Defendant signed, Ross Croley, GSV's founder and Chief Executive Officer, retains majority ownership and a 100% interest in the Company's governance rights through Croley Investments, LLC. Mr. Croley is the only person with exclusive authority over the business and affairs of GSV, including the full power and authority to authorize, approve or undertake any action on behalf of GSV and to bind GSV, without

9

the necessity of a meeting or other consultation with anyone. The exclusive nature of this authority is well known by Defendant and throughout GSV.

30.     Defendant was bound to additional agreements with GSV.

31.     On February 21, 2020, GSV executed a Compensation Arrangement with Defendant that provided for performance-based cash compensation.  Pursuant to the Compensation Arrangement, "so long as [he was] a managing director of the Company," Defendant agreed to "devote [his] best efforts and full business time and attention to promote the business and affairs of the Company and its affiliated entities, and shall be engaged in other business activities only to the extent that such activities do not materially interfere or conflict with [his] obligations to the Company."  *See* Exhibit 2.

32.     In February 2020, Defendant signed the Amendment to the Operating Agreement, attached hereto as Exhibit 7, which provides that Members, including Defendant, are prohibited from (i) "hir[ing] or attempting] to hire any employee, consultant or independent contractor of the Company or any of its Affiliates"; (ii) "solicit[ing] or attempting] to solicit any such person to change or terminate his or her relationship with the Company or an Affiliate or otherwise to become an employee, consultant or independent contractor to, for or of any other person or business entity"; and (iii) offering "services, products or investment opportunities that are in any way similar to or competitive with those offered by the Company (or any of its affiliates, clients or portfolio companies...").  *See* Exhibit 7, § 2.1.

**B.  Defendant Lacks Decision-making Authority at GSV**

33.     Only Mr. Croley (President), William Nix (Vice President), Ms. Stinnett (Vice President), and Michael Casas (Secretary) are officers of GSV Management, LLC. Operating Agreement, Exhibit 1 at Ex. D. Defendant is not now and has never been an officer of GSV Acquisitions, LLC or GSV Management, LLC; Defendant is a signatory to the Operating

10

Agreement.

34.     Under GSV Acquisitions, LLC's Operating Agreement, as signed by Defendant, Mr. Croley maintains the entirety (100%) of all governance controls, and all investment decisions are entrusted exclusively to Mr. Croley.  Operating Agreement, Exhibit 1 at Ex. E. The Operating Agreement also provides that "[t]he President [Mr. Croley] shall have authority to make contracts on behalf of the company in the ordinary course...."  Operating Agreement, Exhibit 1, § 5.2(a). As the sole person who controls GSV's governance, the ultimate decision whether to pursue an acquisition by GSV is, and has always been, solely up to Mr. Croley.  All investment level decisions are entrusted only to Mr. Croley, and the only manner in which Mr. Croley's authority has been delegated is in permitting Mr. Nix to sign letters of intent, in addition to Mr. Croley, and Mr. Casas is permitted to sign and enter into non-disclosure agreements on behalf of GSV.

35.     GSV Acquisitions, LLC's wholly-owned subsidiary, GSV Management, LLC typically is the contracting party to GSV's non-disclosure agreements and letters of intent.

36.     GSV has an internal standard procedure for determining (i) whether to pursue deals, (ii) what terms would apply to potential deals, and (iii) what approval is required prior to drafting and sending term sheets and letters of intent to potential targets.

37.     This internal process requires obtaining prior approval from Mr. Nix, a Vice President of GSV, and Mr. Croley prior to sending deal terms and letters of intent to prospective targets.  In the normal course, a member of GSV's sale team will approach Mr. Nix and Mr. Croley with any prospective deal and follow up with them via email to outline the proposed terms of a potential deal.  Mr. Nix or Mr. Croley would then make changes to the proposal, approve the deal, or pass on it altogether.  Only after receiving approval from Mr. Nix or Mr. Croley, Mr. Casas, GSV's General Counsel and Secretary, drafts and sends out letters of intent to prospective targets.

11

Mr. Casas is also authorized to sign all non-disclosure agreements.

38.     Any letter of intent, indication of interest or term sheet sent to a prospective target must be countersigned by either Mr. Croley or Mr. Nix to be effective. Similarly, any non-disclosure, confidentiality or similar agreement entered into by GSV must be countersigned by any of Mr. Croley, Mr. Nix or Mr. Casas to be effective. Defendant is aware of this policy.

39.     Mr. Croley personally discussed this policy with Defendant and Defendant confirmed that he understood and agreed to the policy.

## III.     Defendant's Misconduct

### A.  Defendant Acts Outside the Scope of His Authority and Is Reminded of His Limitations

40.     On or about July 2021, Defendant expressed his desire to start signing letters of intent on behalf of GSV without approval from Mr. Nix or Mr. Croley.

41.     Mr. Casas and Mr. Nix immediately informed Defendant that he could not sign for GSV because his signature had no legal effect unless and until Mr. Nix or Mr. Croley counter-signed the document.  Mr. Croley also had a separate conversation with Defendant emphasizing the importance of this process and the checks and balances put in place.  Defendant was formally reminded by GSV Management to follow the mandatory process for targeting deals.  Defendant told Mr. Croley that he was plainly aware of these requirements and intended to comply with them.

### B.  GSV Discovers Defendant's Misconduct

42.     On or about November 27, 2023, GSV learned for the first time that Defendant had been engaging in very troubling conduct, including soliciting former employees like Abraham Dube to help solicit and enter into transactions purporting to be on behalf of GSV.

43.     GSV had terminated Mr. Dube's employment on August 21, 2023, for his poor sales performance, among other reasons.  At the time of termination, Mr. Dube signed a

12

Confidentiality, Non-Compete, and Non-Solicitation Agreement with GSV Acquisitions LLC which, among other terms, prohibited Mr. Dube from (i) directly or indirectly soliciting or diverting GSV's customers or its Affiliates, (ii) using GSV confidential information for personal benefit, and (iii) working with the Company's affiliates, employees, or contractors.

44.     Upon information and belief, in the process of holding themselves out as GSV, Defendant and Mr. Dube used Proprietary GSV Information, like the Target Customer Data, Investor Deck, and other sensitive information.

45.     Mr. Croley learned from business acquaintances in the Knoxville community that Defendant (who was still working for GSV at the time) connected with formerly terminated GSV employee, Mr. Dube, on multiple occasions and as recently as November 2023, with the intent of organizing a side enterprise.

46.     Upon information and belief, with their side enterprise, Defendant and Mr. Dube intend to make acquisition deals on their own behalf and for GSV competitors, under the guise of GSV's affiliation and successful track record.

47.     Mr. Croley's Knoxville business acquaintances also informed Mr. Croley that Mr. Dube has been boasting about his recent work with Defendant since his termination. Upon information and belief, Mr. Dube has even stated that he and Defendant were using the very same leads and contacts as GSV.

48.     Understandably, GSV found the news that Defendant was soliciting deals with Mr. Dube without GSV's knowledge or approval to be highly concerning. To start, Defendant is prohibited from soliciting formerly terminated employees pursuant to the Amendment to the Operating Agreement Defendant signed. More importantly, he lacks authority to (i) bind GSV including through letters of intent, (ii) usurp corporate opportunities from GSV, and (iii) use

13

GSV's name and goodwill without GSV's knowledge and approval. Instead, only Mr. Croley and Mr. Nix are authorized to sign letters of intent, and only Mr. Croley, Mr. Nix, and Mr. Casas are authorized to sign and enter into non-disclosure agreements on behalf of GSV.

49. On or about November 29, 2023, Mr. Casas reminded Defendant by phone that he had no authority to execute deals, term sheets, or letters of intent to prospective founders on behalf of GSV without first sending the proposed deal to Mr. Nix and Mr. Croley for approval and then obtaining Mr. Nix's or Mr. Croley's countersignature. Defendant acknowledged that he was bound by those terms when they were conveyed.

50. GSV initiated an investigation after learning about Defendant's purported conduct in impermissibly soliciting former employees and engaging in unapproved deal outreach.

51. GSV also took steps to try to prevent further misrepresentations by Defendant. Mr. Croley directed GSV to remove Defendant's biography and profile from GSV's website on or about November 29, 2023. Mr. Croley confirmed all references to Defendant had been removed from GSV's website.

## C. Investigation Further Proves Defendant's Misconduct

52. In the course of an investigation, on November 28, 2023, GSV found a large volume of evidence demonstrating Defendant's unauthorized targeting of prospective clients without approval on GSV letterhead, using GSV's name, GSV Trademarks, and goodwill.

53. Defendant used GSV letterhead to reach out to various targets without GSV**'s** authorization. GSV's letterhead prominently features the GSV Trademarks.

54. As recently as December 2023, Defendant has prospected **at least seven (7) companies** in writing without GSV's knowledge or the requisite approvals, and failed to comply with the proper protocols needed to sign documents on behalf of GSV. These companies include non-parties **Company 1**, **Company 2**, **Company 3**, **Company 4**, **Company 5**, **Company 6**, and

14

**Company 7**.[6] Although GSV does not yet know the value of all seven transactions Defendant prospected, the total proposed value of the Company 1, Company 2, Company 3, and Company 7 deals is at least $140 million.

### D. Defendant's Unauthorized Dealings with Non-Party Company 1

55. Non-party Company 1 is a technology company based in Florida that provides customers with end-of-life preparation services.

56. On April 21, 2023, Mr. Dube sent Defendant an updated unsigned term sheet for Company 1. At that point, Mr. Dube was still employed by GSV. However, it is highly unusual and contradictory to GSV policy or processes for a mid-level associate, like Mr. Dube, to prepare, update, or externally propose a draft deal term sheet.

57. The term sheet notably contains the GSV Trademarks. This term sheet provides a total enterprise value in the tens of millions of dollars, with 45 days to close the deal and commits GSV to "join[] [Company 1] shareholders on cap table." It is also riddled with font inconsistencies and formatting errors. Defendant's term sheet was not drafted by Mr. Casas, nor was it sent to Mr. Nix nor Mr. Croley for their approval, and is not an authorized or official GSV document.

58. Defendant never informed GSV that he was initiating an offer to Company 1 on behalf of GSV. Prior to November 29, 2023, GSV had no knowledge that Defendant and Mr. Dube prepared a term sheet for Company 1 on behalf of GSV. Defendant's actions with respect to Company 1 violated GSV's protocols, and he acted without the authority of GSV.

---

[6] GSV has anonymized the names of these third parties to protect their identities. GSV will provide the Court with these names upon the Court's request; Defendant is well-aware of the names of these companies.

### E.  Defendant's Unauthorized Dealings with Non-Party Company 2

59.     Upon information and belief, non-party Company 2 is a company based in New Jersey which offers an all-in-one event management platform for ticketing, registration, and virtual events.

60.     On or about August 2023, Defendant prepared an unsigned term sheet for Company 2.  The term sheet notably contains the GSV Trademarks.  This term sheet provides a total Company 2 enterprise value of tens of millions of dollars, offers over half that value in cash at close, and notes that GSV will send a letter of intent "that gives us 45-60 days of exclusivity to close the deal." It is also riddled with font inconsistencies and formatting errors.  Defendant's term sheet was not drafted by Mr. Casas, nor was it sent to Mr. Nix nor Mr. Croley for approval, and is not an authorized or official GSV document.

61.     On or about July 2023, Defendant approached Mr. Croley about the Company 2 opportunity, and presented it as a deal that the firm should not pursue because the financial profile was not as strong as originally believed.  Accordingly, Mr. Croley understood that GSV would not pursue the Company 2 deal because of these financial performance issues.

62.     Mr. Croley was therefore shocked to learn that Defendant reached out to Company 2 purportedly on behalf of GSV after this conversation.  Prior to November 29, 2023, GSV and Mr. Croley had no knowledge that Defendant was targeting Company 2 on behalf of GSV nor that Defendant prepared a term sheet for Company 2 on behalf of GSV after July 2023.  His actions with respect to Company 2 violated GSV's protocols and he acted without the authority of GSV.

### F.  Defendant's Unauthorized Dealings with Non-Party Company 3

63.     Upon information and belief, non-party Company 3 is a commercial restaurant equipment distributor based in Texas.

64.     On September 7, 2023, Defendant contacted the founder and president of Company

16

3 via his GSV email account about the prospect of GSV acquiring the company. After ongoing discussions with Company 3, on September 28, 2023, Defendant prepared an Excel worksheet tracking financial metrics and forecasted revenue with respect to the deal.

65. On October 19, 2023, using GSV letterhead, Defendant sent a letter of intent, summarizing the potential acquisition by GSV to acquire Company 3. This letter of intent contemplates GSV acquiring all of Company 3's shares at an enterprise value of a few million dollars. Notably, this letter of intent contains the GSV Trademarks. Defendant never sent this letter of intent to Mr. Croley or Mr. Nix for approval as evidenced by the lack of a requisite countersignature.

66. Unlike the other term sheets GSV uncovered, this letter of intent was countersigned by the President of Company 3 on October 19, 2023. This letter of intent was not drafted by Mr. Casas (as is GSV's policy) and is not an authorized or official GSV document.

67. Despite his representations, Defendant never informed GSV that he was targeting Company 3 on behalf of GSV. Prior to November 28, 2023, GSV had no knowledge that Defendant prepared a letter of intent for Company 3 on behalf of GSV. Defendant's actions with respect to Company 3 violated GSV's protocols as outlined above.

68. On November 30, 2023, Mr. Casas sent an email notice, and subsequently followed up via certified mail, to Company 3 to inform it that Defendant no longer worked at GSV and that any term sheet or letter of intent it received from Defendant purporting to be sent on behalf of GSV was not an official communication.

69. GSV did not initially receive a response to that email notice, however, as detailed below, the President of Company 3 reached out to Mr. Casas on December 11, 2023 by telephone to follow up about GSV's November 30, 2023 correspondence regarding Defendant.

17

70.     On December 11, 2023, Mr. Casas again informed the President of Company 3 that any letter of intent Defendant had entered into with Company 3 was not approved by GSV's investment committee and was an unauthorized use of the GSV Trademarks, as well as possible fraud by Defendant on Company 3.  Mr. Casas reiterated that Defendant had not been acting on GSV's behalf during his discussions with Company 3.  Mr. Casas further made clear to the President of Company 3 that GSV was not the buyer of Company 3 and never had been, in order to provide Company 3 with as much opportunity as possible to mitigate any losses it may have or could in the future incur due to Defendant's misrepresentation that he was acting on behalf of GSV.

71.     The President of Company 3 confirmed that Defendant and Mr. Dube had been negotiating a deal with Company 3, supposedly as representatives of GSV and on GSV's behalf. Indeed, according to the President of Company 3, Defendant and Mr. Dube gave a compelling presentation to Company 3 concerning what resources GSV could bring to bear.  The President of Company 3 noted that his interest in doing a deal was premised on GSV being the buyer.

72.     The President of Company 3 was shocked and upset to learn that Defendant and Mr. Dube were neither authorized to negotiate deals nor make any representations or agreements on behalf of GSV.  The President of Company 3 expressed concerns that Company 3 had spent extensive time and money negotiating a deal with Defendant that was supposed to close before the year's end, and that this had put the company in a bad situation.  The President of Company 3 also conveyed that Company 3 had spent resources negotiating with a key supplier of Company 3, as was necessary for the deal on Company 3's side, and that GSV being the investor—not Defendant as an individual—was also integral to that supplier in agreeing to support the deal Defendant offered.

73. At no point in time did Defendant tell the President of Company 3 or anyone else at Company 3 that he had been separated from GSV and could not act on behalf of GSV in any capacity. The President of Company 3 even confirmed that Defendant and Mr. Dube were still actively negotiating this deal, and in fact the pair had planned a meeting with Company 3 for the very next day, December 12, 2023, to further solidify the prospective deal. Upon information and belief, this meeting was also supposed to include an employee of a competitor of GSV.

74. GSV is also aware that Company 3 provided diligence documents to Defendant via a virtual data room at various times throughout the week after Defendant's December 1, 2023 separation from GSV, the nature of which suggests Defendant was continuing to make diligence requests to Company 3, even after his separation from GSV.

75. On December 11, 2023, GSV's outside counsel contacted Defendant and Mr. Dube's attorneys to demand their clients cease and desist from their unlawful conduct and confirm whether they would cancel the meeting scheduled with Company 3 for December 12, 2023.

76. On December 12, 2023, GSV received confirmation from Defendant and Mr. Dube's attorneys that their clients would not be meeting with Company 3.

**G. Defendant's Unauthorized Dealings with Non-Party Company 4**

77. Upon information and belief, non-party Company 4 is a Canadian company in the insurance brokerage industry.

78. On October 19, 2023, using GSV letterhead, Defendant sent a signed, non-binding term sheet to Company 4. It was not drafted by Mr. Casas, nor was it sent to Mr. Nix nor Mr. Croley for approval and is not an authorized or official GSV document. The term sheet shows Defendant's intent to partner with Company 4 "to help unlock purchase price arbitrage via a joint venture" on behalf of GSV.

79. In its history, GSV has never consummated or proposed what would typically be

19

categorized in the private investment industry as a joint venture, evidencing the oddness of this term sheet and the fact that it was not prepared consistent with GSV's standard practice or protocol. This term sheet was also presented on behalf of Greater Sum Ventures, LLC, which is an investment-related special purpose vehicle affiliated with GSV, but is in no way an operating entity. This entity would never be authorized to sign a GSV letter of intent, which further evidences Defendant prepared the document outside of GSV's approval process.

80.     Defendant never informed GSV that he was targeting Company 4 on behalf of GSV. Prior to November 28, 2023, GSV had no knowledge that Defendant prepared a term sheet for Company 4 on behalf of GSV. Defendant's actions with respect to Company 4 violated GSV's protocols and he was acting without the authority of GSV.

81.     Upon information and belief, Defendant knew about the Company 4 opportunity by utilizing GSV resources and confidential Target Customer Data. GSV had previously reached out to a separate company, which is also owned by the founder of Company 4, on or about July 2023.

82.     On November 30, 2023, Mr. Casas sent an email notice, and subsequently followed up via certified mail, to Company 4 to inform it that Defendant no longer worked at GSV and that any term sheet or letter of intent received from Defendant purporting to be sent on behalf of GSV was not an official communication. GSV did not receive a response to its email or certified letter.

**H. Defendant's Unauthorized Dealings with Non-Party Customer 5**

83.     Upon information and belief, non-party Company 5 is an all-in-one e-commerce shipping solution platform headquartered in Utah.

84.     Upon information and belief, on October 25, 2023, nearly two months after GSV terminated Mr. Dube's employment, Defendant and Mr. Dube met remotely via Zoom. Defendant titled the meeting "[Company 5] <> GSV." Upon information and belief, this meeting is a

20

reflection of Defendant and Mr. Dube's inappropriate attempts to target Company 5, which is a target priority of one of GSV's portfolio companies.

85.     Defendant's actions with respect to Company 5 violated GSV's protocols, and he was acting without the authority of GSV.  Defendant also never informed GSV that he enlisted and utilized a terminated former GSV employee to target on behalf of GSV.

**I.   Defendant's Unauthorized Dealings with Non-Party Company 6**

86.     Upon information and belief, non-party Company 6 is a Delaware limited liability company in the capital finance and payments solutions industry.

87.     On September 15, 2023, Defendant sent a mutual confidentiality and non-disclosure agreement to Company 6, which he signed purportedly on behalf of GSV. The document uses GSV's Trademark, but was not drafted by Mr. Casas, nor was it sent to Mr. Nix nor Mr. Croley for approval. It is not an authorized or official GSV document.

88.     Defendant's actions with respect to Company 6 violated GSV's protocols, and he was acting without the authority of GSV.  Defendant also never informed GSV that he targeted or communicated with Company 6 on behalf of GSV.

89.     Immediately after discovering Defendant's communications with Company 6 as part of its ongoing investigation, Mr. Casas sent an email notice to Company 6, on December 12, 2023, to inform it that Defendant no longer worked at GSV and that any document or correspondence it received from Defendant purporting to be sent on behalf of GSV was not an official communication. General Counsel for Company 6 responded to Mr. Casas's email and stated Company 6 had relied on GSV's NDA, and further understood Defendant was or had been managing director and co-founder of GSV.  General Counsel for Company 6 also expressed concern that Defendant's conduct constituted potential misuse of Company 6's confidential information.

21

**J. Defendant's Unauthorized Dealings with Non-Party Company 7**

90.     Upon information and belief, non-party Company 7 is a fintech company based in New York that offers tools to extend business payment terms.

91.     On October 31, 2023, Defendant sent Company 7 an indication of interest letter summarizing terms for a proposed acquisition of Company 7.  The letter was drafted on GSV letterhead, and Defendant signed the letter as Managing Partner of GSV Management, LLC. Defendant indicated that GSV would acquire all of Company 7's equity at a purchase price of tens of millions of dollars, payable with a percentage in rollover, with the remainder in cash. The letter notably contains the GSV Trademarks.

92.     Defendant never informed GSV that he was targeting Company 7 on behalf of GSV let alone that he executed a letter of intent on behalf of GSV.  Prior to December 12, 2023, GSV had no knowledge that Defendant prepared this letter of interest for Company 7 on behalf of GSV. Even worse, GSV intended to pursue a deal with Company 7 for one of its portfolio companies. In fact, in 2022, Mr. Casas signed a non-disclosure agreement with Company 7 on behalf of one of GSV's portfolio companies.

93.     With respect to his dealings with Company 7, Defendant acted without authority by violating GSV's protocols, exploiting his former relationship with GSV, and usurping a prospective business opportunity away from GSV.

94.     Immediately after discovering Defendant's communications with Company 7 as part of its ongoing investigation, Mr. Casas sent an email notice to Company 7, on December 12, 2023, to inform it that Defendant no longer worked at GSV and that any document or correspondence it received from Defendant purporting to be sent on behalf of GSV was not an official communication.

22

**K. Defendant Solicited Transactions for Personal Gain While a Managing Director of GSV**

95. Defendant also violated the terms of the Compensation Agreement by soliciting banks for funding and target companies for transactions for his personal gain while Defendant was a Managing Director of GSV. Indeed, while Defendant was a managing director of GSV, he was focused on outside ventures and not his duties as managing director of GSV.

96. The Compensation Agreement provides that, "for so long as [he was] a managing director of the Company," Defendant agreed to "devote [his] best efforts and full business time and attention to promote the business and affairs of the Company and its affiliated entities, and shall be engaged in other business activities only to the extent that such activities do not materially interfere or conflict with [his] obligations to the Company."

97. On September 7, 2023 Defendant solicited funding from a banker via email, stating that a business (Company 3) had "come up for sale" and Defendant's father-in-law "would like [Defendant] to look at buying it with him." In that email, Defendant proposed a purchase price of a few million dollars, and asked the banker for "guidance on what kind of lending options would be available for a company like" Company 3, which Defendant described as not "fit[ting] the profile of what we do at GSV."

98. Similarly, on November 8, 2023, Defendant sent an email to the founder of yet another company, Company 8, seeking to introduce himself as "the co-founder of two multi billion dollar SAAS companies." Defendant further stated in that email: "I invest my own dollars in software companies…and when the founder is open to the idea, I like to invest for life."

99. Until GSV undertook an investigation beginning in late November 2023, GSV was unaware of Defendant's use of his GSV company email, while bound by the Compensation Arrangement, to solicit transactions and funding for transactions for his personal gain.

23

**L. Defendant's Misappropriation of Proprietary GSV Data**

100. In addition to the unauthorized matters described above, Defendant also improperly accessed and potentially downloaded for personal use mass proprietary non-public Target Customer Data relating to GSV's proprietary taxonomy classifications, leads, qualitative performance assessments, and customers.

101. GSV uses an electronic database system called Salesforce to track the Company's performance history as well as its employees' recruiting and outreach efforts. GSV requires its employees, for example, to contemporaneously document all of their communications with clients and potential clients, which is then stored on Salesforce.

102. GSV's Target Customer Data is compiled using GSV's proprietary software tool "Synth," and contains evaluations of those companies using GSV's proprietary taxonomy classifications, qualitative analysis concerning each company conducted by GSV analysts, and GSV's proprietary scoring and ranking method, which reflects GSV's unique investment criteria.

103. In the ordinary course, GSV keeps private, commercially sensitive, and confidential company and client data stored in the Target Customer Data. GSV Target Customer Data is protected by a user password and multi-authentication protection, and only those at GSV who have a need to know have access to this data.

104. Although Defendant had access to GSV's Target Customer Data, he could only view this data after using multifactor identification to verify his sign in. Defendant was not authorized to download any GSV Target Customer Data for personal use.

105. While Defendant was still affiliated with GSV, he obtained a draft PDF copy of the GSV Investor Deck on September 25, 2023. This Investor Deck was not to be altered or edited in any way. The Investor Deck outlined each of GSV's historic investments as well as the calculated returns made on each individual deal. Defendant later specifically sought and obtained portions

24

of an editable copy of the Investor Deck from a GSV associate in early November 2023. It would be highly unusual for Defendant or any other member of the GSV sales or sourcing team to use or rely on this deck, because GSV uses the Investor Deck to raise capital from GSV's co-investors, not to solicit acquisitions.

106. In the ordinary course, GSV takes reasonable measures to ensure that it keeps all investor-related slide deck presentations and Proprietary GSV Information confidential as the investor decks are valuable resources used by GSV to raise capital. Indeed, GSV spent considerable time and effort creating a recent marketing deck that highlights various investing strategies and capabilities.

107. It is extremely concerning that the Investor Deck remains in Defendant's hands, especially when he no longer works for GSV. GSV would lose its competitive advantage if Defendant is relying on GSV's valuable and confidential Investor Deck and leveraging the performance history of GSV's deals contained therein to solicit targets and investors. Further, Defendant could use the Investor Deck to represent that he is soliciting deals or attempting to obtain financing on behalf of GSV when he no longer works with GSV and had no authorization to do so.

108. If Defendant has edited the Investor Deck in any manner or distributed this deck to individuals outside of GSV, he has done so without company permission using GSV's name and brand. GSV does not know the extent to which Defendant has used or modified this confidential Investor Deck.

## M. GSV Questions and Warns Defendant About His Actions

109. On November 29, 2023, Mr. Casas and Mr. Croley met with Defendant by phone to question him about the current deals on his plate and inquire about his specific involvement with the unauthorized transactions and joint-venture deals described above. At this point, Mr.

25

Casas and Mr. Croley knew only that Defendant had been communicating with targets like Company 1, Company 2, Company 3, Company 4, and Company 5, and were unaware of his actions with respect to Company 6 and Company 7.

110.    Despite Defendant's full knowledge that GSV deals were to be made only with the express approval of GSV management, when initially asked about his involvement with Company 3, Defendant expressed shock that Mr. Casas and Mr. Croley knew about the deal.  On this call, Defendant represented that he was on track to close the Company 3 deal by the end of December, stating this deal was for his personal account.

111.    When asked about his involvement with Company 2, Company 4, and Company 5, Defendant did not provide much insight.  He did not give cogent explanations why he sourced deals on behalf of GSV without first obtaining the requisite authorization or why he entered into agreements and signed documents on behalf of GSV.

112.    When asked directly whether Defendant engaged with Mr. Dube to source deals, Defendant denied his involvement despite evidence that the two worked on deals together after GSV terminated Mr. Dube's employment on August 21, 2023.

## N.  Defendant and Mr. Dube Continue Misconduct Despite Warnings and Permanent Removal from GSV

113.    GSV severed its relationship with Defendant in light of the serious fiduciary and other breaches uncovered by the company's investigation.  On December 1, 2023, Mr. Croley, on behalf of GSV, sent a letter to Defendant to inform him he was no longer affiliated with GSV and had no authority to act on behalf of the Company in any capacity.  The letter further demanded Defendant stop using GSV's brand and performance history, and cease making any references to a continued affiliation with GSV.  GSV also urged Defendant to comply with a host of requests, including but not limited to disclosing all prospective clients he reached out to on behalf of GSV.

Defendant was officially removed as "Managing Director" of GSV, and he is no longer listed on GSV's website.

114. In addition, on December 1, 2023, GSV's outside counsel sent a letter to Mr. Dube demanding he cease and desist from his unlawful behavior and enclosing his Restrictive Covenant Agreement.

115. Other than acknowledgement of these December 1, 2023 letters by Mr. Dube and Defendant's counsel, and a separate December 11, 2023 email response from Mr. Dube and Defendant's counsel concerning cancellation of the December 12, 2023 meeting with Company 3, there has been no response by Mr. Dube, Defendant, or their representatives to GSV's outside counsel's December 1, 2023 letters.

116. On December 4, 2023, GSV followed up with non-parties Company 3 and Company 4, and on December 12, 2023, GSV followed up with non-parties Company 6 and Company 7 to inform them via email that Defendant no longer worked at GSV and that any term sheet or letter of intent they received from Defendant purporting to be sent on behalf of GSV was not an official communication. GSV has not heard back from Company 4.

## CAUSES OF ACTION

### COUNT ONE – LANHAM ACT VIOLATION
### Trademark Infringement in Violation of 15 U.S.C. §1114

117. GSV incorporates by reference all of the allegations as if fully set forth herein.

118. GSV's valid trademark in the Greater Sum Ventures Mark is federally is registered with the United States Patent and Trademark Office as of July 25, 2017 (US Registration Number: 5250254).

119. Without GSV's authorization or consent, Defendant used the GSV Registered Mark in interstate commerce, including when he reached out to potential clients and targets in other

27

states utilizing the GSV Trademarks purporting to act on behalf of GSV without authorization, and sent letters of intent and term sheets bearing the GSV Trademarks without the authorization of GSV.

120.    Defendant's unauthorized use of the GSV Registered Mark has caused confusion and will continue to cause confusion because third parties contacted by Defendant have been deceived into believing that Defendant's communications and offers were associated with, sponsored by, endorsed by, or authorized by GSV, when they were not.

121.    Defendant's unauthorized use of the GSV Registered Mark was willful.  He acted with the intent to benefit from GSV's reputation and excellent track record.

122.    Defendant's use of the GSV Registered Mark without authorization of GSV constitutes trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114(a).

123.    As a result of Defendant's conduct, GSV has suffered—and, unless Defendant's conduct is preliminarily and permanently enjoined, will continue to suffer—actual damages and irreparable harm to which it has no adequate remedy at law.

124.    Because Defendant's actions have been willful, GSV is entitled to an award of costs and, this being an exceptional case, enhanced damages and reasonable attorneys' fees.

<div align="center">

**COUNT TWO – LANHAM ACT VIOLATION**
**Trademark Infringement, 15 U.S.C. §1125(a)**

</div>

125.    GSV incorporates by reference all of the allegations as if fully set forth herein.

126.    GSV has used the valid GSV Marks in continuously in commerce since March 2016.  GSV has used the GSV Marks consistently, extensively, and repeatedly throughout its website, in promotional materials, and in communications with clients and potential clients.

127.    Without GSV's authorization or consent, Defendant used the GSV Marks in commerce, including when he reached out to potential clients and targets utilizing the GSV Marks

<div align="center">28</div>

purporting to act on behalf of GSV without authorization, and sent letters of intent and term sheets bearing the GSV Marks without the authorization of GSV.

128.    Without GSV's authorization or consent, Defendant also used the GSV Marks in commerce when he made a Power Point presentation containing GSV Marks to representatives of Company 3 in Florida.

129.    Defendant's unauthorized use of the GSV Marks has caused confusion and will continue to cause confusion because third parties contacted by Defendant have been deceived into believing that Defendant's communications and offers were associated with, sponsored by, endorsed by, or authorized by GSV, when they were not.

130.    Defendant's unauthorized use of the GSV marks was willful.  He acted with the intent to benefit from GSV's reputation and excellent track record.

131.    Defendant's use of the GSV Marks without authorization of GSV constitutes trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1125(a).

132.    As a result of Defendant's conduct, GSV has suffered—and, unless Defendant's conduct is preliminarily and permanently enjoined, will continue to suffer—actual damages and irreparable harm to which it has no adequate remedy at law.

133.    Because Defendant's actions have been willful, GSV is entitled to an award of costs and, this being an exceptional case, enhanced damages and reasonable attorneys' fees.

**COUNT THREE – LANHAM ACT VIOLATION**
**False Designation of Origin and False Endorsement, 15 U.S.C. §1125(a)**

134.    GSV incorporates by reference all of the allegations as if fully set forth herein.

135.    Defendant made false and deceptive statements, including but not limited to making offers of investments on behalf of GSV unbeknownst to GSV, signing letters of intent and term

sheets on behalf of GSV without authorization, giving unsanctioned presentations of GSV's business models, and negotiating unauthorized business in GSV's name. These false statements violate the Lanham Act, 15 U.S.C. §1125(a), which prohibits in relevant part, any "false or misleading description of fact, or false or misleading representation of fact which…is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association or such person with another person, or as to the origin, sponsorship, or approval of his or her…services."

136.    Defendant's false and deceptive statements were made in interstate commerce, in that they were made by a party (Defendant) who was offering investment services in other states, including to Company 3 in Florida, purporting to act on behalf of GSV.

137.    Defendant made his false and deceptive statements knowingly and willfully, or recklessly to target companies and the general public.

138.    Defendant's false and deceptive misrepresentations about his affiliation with GSV have caused confusion (and, unless stopped, will continue to cause confusion) about the source of Defendant's services and offers.

139.    Defendant's false and deceptive misrepresentations about his affiliation with GSV are material and will affect the purchasing and investment decisions of Company 4, Company 3, and other target companies who believe they are transacting with GSV.

140.    Defendant's false and deceptive misrepresentations about his affiliation with GSV have caused, and are likely to cause, substantial harm to GSV the marketplace, including lost business and loss of goodwill and reputation. GSV is entitled to all relief available for such false and deceptive statements, including but not limited to injunctive relief, disgorgement of Defendant's ill-gotten profits, recovery of GSV's damages, attorneys' fees, the costs of this action,

30

and treble damages in accordance with 15 U. S. C. §1117(a).

**COUNT FOUR – VIOLATION OF TENNESSEE TRADE SECRETS ACT**
**Misappropriation of Trade Secrets, T.C.A. § 47-25-1701,** *et seq.*

141.    GSV incorporates by reference all of the allegations as if fully set forth herein.

142.    In his role as a Member and Managing Director at GSV, Defendant had access to trade secrets.

143.    One of these trade secrets is GSV's Target Customer Data, which is compiled using GSV's proprietary software called Synth, and contains evaluations of those companies using GSV's proprietary taxonomy classifications, qualitative analysis concerning each company conducted by GSV analysts, and GSV's proprietary scoring and ranking method, which reflects GSV's unique investment criteria.

144.    In the ordinary course, GSV Target Customer Data is protected by a user password and multi-authentication protection, and only those at GSV who have a need to know have access to this data.

145.    Another one of the trade secrets is the Investor Deck, which includes GSV's confidential investing strategies and capabilities and is used to pitch potential investors.

146.    In the ordinary course, GSV takes reasonable measures to ensure that it keeps all investor related slide deck presentations and materials confidential as the investor decks are valuable resources used by GSV to raise capital.

147.    GSV Target Customer Data and the Investor Deck are exclusive to GSV and not generally known.

148.    GSV Target Customer Data and the Investor Deck are the subject of efforts that were reasonable under the circumstances to main their secrecy.  GSV Target Customer Data and the Investor Deck are made available only to key employees on a need-to-know basis and are

31

protected from general access. GSV takes reasonable measures to keep the GSV Target Customer Data and the Investor Deck secret.

149. The GSV Target Customer Data and the Investor deck derive independent economic value by not being known or readily ascertainably by proper means to competitors.

150. Upon information and belief, Defendant disclosed and utilized and continues to disclose and utilize the GSV Target Customer Data and the Investor Deck to solicit customers and targets without the authorization, and in direct competition with, GSV, in violation of the Tennessee Uniform Trade Secrets Act, T.C.A. § 47-25-1701, *et seq.*

151. The wrongful disclosure and use of the GSV Target Customer Data and the GSV Investor Deck by Defendant, acting individually, constitutes misappropriation of the same under T.C.A. § 47-25-1701, *et seq.*

152. GSV did not consent to Defendant's disclosure and use of the GSV Target Customer Data and the GSV Investor Deck in his individually capacity.

153. The misappropriation of GSV's trade secrets has caused and will continue to cause GSV irreparable and substantial injury and therefore cannot be fully redressed through damages alone. An injunction prohibiting Defendant from further use or disclosure of GSV's trade secrets and requiring Defendant to destroy any GSV trade secrets information is necessary to provide GSV with complete relief.

154. Defendant's misappropriation of GSV's trade secrets is willful and malicious and thereby entitles GSV to an award of exemplary damages and attorneys' fees.

155. The wrongful misappropriation of GSV's trade secrets has caused and will continue to cause damages to GSV, entitling GSV to injunctive relief, compensatory damages, exemplary damages and attorneys' fees, all pursuant to TCA §§ 47-25-1703 through 47-25-1705.

## COUNT FIVE—BREACH OF CONTRACT

156.     GSV incorporates by reference all of the allegations as if fully set forth herein.

157.     The Operating Agreement (including all amendments) is a valid and enforceable contract between Defendant and the other members of GSV.

158.     The Amended to the Operating Agreement prohibited Defendant from, *inter alia*, offering "services, products or investment opportunities that are in any way similar to or competitive with those offered by the Company (or any of its affiliates, clients or portfolio companies)." *See* Exhibit 7 § 2.1.

159.     In soliciting customers including non-parties Company 3, Company 4 and others without the authorization of GSV, Defendant is offering services similar to or competitive with those of GSV and is in breach of the Operating Agreement.

160.     GSV has been damaged and will continue to be damaged as a result of this breach.

161.     The Compensation Arrangement Agreement is a valid and enforceable contract between Defendant and GSV.

162.     The Compensation Arrangement provides that, in exchange for performance-based cash compensation, Defendant shall, *inter alia*, "devote [his] best efforts and full business time and attention to promote the business and affairs of the Company."

163.     In soliciting deals without the authorization of GSV with the intent of organizing a side enterprise to make acquisition deals for his own benefit and with former employee Mr. Dube, Defendant is in violation of the Compensation Arrangement Agreement.

164.     In addition, by soliciting banks for funding and target companies for transactions for his personal gain while Defendant was a Managing Director of GSV, Defendant was focused on outside ventures and not his duties as Managing Director of GSV, in breach of the

Compensation Arrangement Agreement.

165. GSV has been damaged and will continue to be damaged as a result of this breach.

## COUNT SIX – BREACH OF FIDUCIARY DUTY

166. GSV incorporates by reference all of the allegations as if fully set forth herein.

167. GSV is a limited liability company organized under the laws of the State of Tennessee.

168. Defendant, at all relevant times, was a member of GSV. Defendant, at all relevant times, knew GSV's internal process required obtaining prior approval from Mr. Nix and Mr. Croley prior to sending deal terms and letters of intent to prospective targets.

169. Defendant, at all relevant times, was fully aware that he had no authority to execute non-disclosure agreements, term sheets, or letters of intent to prospective founders without first sending the proposed deal to Mr. Nix and Mr. Croley for approval.

170. Defendant, at all relevant times, knew that he was required to obtain Mr. Nix or Mr. Croley's countersignature before sending out any non-disclosure agreements, letters of intent, indications of interest or term sheets on behalf of GSV.

171. Defendant deliberately evaded the proper process for negotiating potential deals on behalf of or in relation to his role with GSV.

172. Defendant clearly and intentionally acted outside of his limited role for GSV.

173. Defendant leveraged GSV's goodwill in order to target prospects in secrecy for his own personal gain and at the expense of damaging GSV's reputation and goodwill with prospective clients.

174. Defendant used GSV letterhead, including GSV Trademarks, without authorization.

34

175.    Defendant prospected at least seven (7) companies in writing without GSV's knowledge or the requisite approvals, and failed to comply with the proper protocols needed to sign documents on behalf of GSV.

176.    Defendant represented himself as acting on behalf of GSV with the ability to sign deals on behalf of GSV in his interactions with at least one company, without GSV's knowledge or the requisite approval.  Defendant continued to misrepresent himself as acting on behalf of GSV to this company even after Defendant had been removed from GSV.

177.    Defendant deliberately kept GSV's management in the dark about his actions.

178.    Defendant's actions clearly prioritized his own self-serving interests above the interests of GSV.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray this Court enter judgment in their favor on all claims and grant the following relief:

179.    For compensatory and exemplary punitive damages to which they are entitled in an amount to be determined through discovery and trial, including enhanced damages and reasonable attorneys' fees under Counts One and Two of this Complaint as well as treble damages under Count Three of this Complaint;

180.    For injunctive relief against Defendant: (i) preventing Defendant from soliciting, further negotiating, signing, or closing transactions with non-parties Company 1, Company 2, Company 3, Company 4, Company 5, Company 6, Company 7, and any other third parties under GSV's (or any of GSV's portfolio companies') name or marks; (ii) preventing Defendant from using GSV's (or any of GSV's portfolio companies') name, trademark, logo, letterhead, resources, and goodwill to target any other business prospects; (iii) requiring Defendant to return all

35

confidential GSV information retained by him, regardless of the form in which that information has been maintained or downloaded; and (iv) enjoining Defendant and all those in concert or participation with Defendant from disclosing or using any of GSV's proprietary information or trade secrets;

181.   For an award to GSV of pre-judgment and post-judgment interest, costs, and fees, including attorneys' fees; and

182.   Any other relief the Court deems just and proper.


Dated: December 15, 2023

<div style="margin-left:40%">

*/s/ Shayne R. Clinton*
**BASS, BERRY & SIMS PLC**
Shayne R. Clinton (BPR #026245)
900 S. Gay Street, Suite 1700
Knoxville, Tennessee 37902
Telephone: (865) 521-6200
Facsimile: (615) 742-6293
E-mail: sclinton@bassberry.com

-and-

**WEIL, GOTSHAL & MANGES LLP**
Yehudah L. Buchweitz (*pro hac vice* motion forthcoming)
Randi W. Singer (*pro hace vice* motion forthcoming)
Cameron Mae Bonk (*pro hac vice* motion forthcoming)
Elizabeth McLean (*pro hac vice* motion forthcoming)
767 Fifth Avenue
New York, New York 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
E-mail: yehudah.buchweitz@weil.com
        randi.singer@weil.com
        cameron.bonk@weil.com
        elizabeth.mclean@weil.com

*Attorneys for Plaintiffs GSV Acquisitions, LLC and GSV Management, LLC*

</div>

36